U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

FEB 0 1 2006

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

*Monroe*
~~ALEXANDRIA~~ DIVISION

MICHAEL O'SHAY LOWERY,
          Petitioner

VERSUS

BURL CAIN, WARDEN,
          Respondent

CIVIL ACTION
SECTION "P"
NO. CV04-2379-A

JUDGE ~~ROBE D. DREIL~~ *James*

MAGISTRATE JUDGE JAMES D. KIRK

### REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, in forma pauperis, by pro se plaintiff Michael O'Shay Lowery ("Lowery") on November 18, 2004, and amended on November 21, 2005 (Doc. Item 18). Lowery was convicted in 1999 by a jury in the 3rd Judicial District Court, Lincoln Parish, Louisiana, on one count of second degree murder and one count of obstruction of justice, and was sentenced to life imprisonment and twenty years, to run concurrently.

Lowery raises the following issues for habeas review in his original and supplemental petitions (Doc. Items 1, 18):

1. Whether the evidence adduced at trial was sufficient to support the verdict under the Fourteenth Amendment that Lowery was guilty of second degree murder and obstruction of justice.

2. Whether a racially discriminatory system of selecting the Lincoln Parish grand jury foreman violated Lowery's rights under the Fifth, Sixth, and Fourteenth Amendments?

3. Whether Lowery was denied the right of reasonably effective assistance of counsel due to counsel's failure to (1) challenge the discriminatory practices of

appointing grand jury foremen, (2) file a motion to quash the unconstitutional selection process used to select grand jury foremen in Louisiana, (3) object to the jury charge on principals, and (4) subpoena witnesses to testify favorable for the defense?

4. Whether the trial judge erroneously instructed the jury on the law of principals in regards to aiding and abetting which was contrary to the Fourteenth Amendment due process guarantees?

5. Whether the trial judge violated Lowery's due process rights when he did not properly instruct the jury on the issue of reasonable doubt?

6. Whether the State improperly withheld exculpatory evidence that supported the bill of indictment, which was obtained in violation of due process, through the extraneous influential deliberations of a grand jury member that also testified on behalf of the State at the criminal trial?

<u>Facts</u>

The facts of this case as set forth by the Louisiana Court of Appeal, Second Circuit at <u>State v. Lowery</u>, 33,905 (La.App. 2 Cir. 2/28/01), 781 So.2d 713, 718-721, writ den., 2001-1041 (La. 2/22/02), 809 So.2d 978, are as follows:

"Defendant was indicted by a grand jury for the second degree murder and aggravated kidnapping of Charlie Lewis, who was severely beaten and eventually died of his wounds on February 19, 1998. The investigation revealed that there were four participants in this heinous crime, the defendant, Michael O'Shay Lowery, his brother, Darryl Lowery, Derrick Mitchell and Corey Brown. [FN1] In a separate trial, Derrick Mitchell was tried and convicted of second degree murder and aggravated kidnapping. [FN2] Darryl Lowery pled guilty to manslaughter. [FN3] Corey Brown ("Corey"), a seventeen year old at the time of the offense, was charged with second degree murder and aggravated kidnapping. Corey and the defendant were also charged with obstruction of justice. Corey pled guilty to obstruction of justice and agreed to testify for the state. All other charges against him were dismissed.

2

"The defendant refused to plead guilty and insisted on proceeding to trial. At trial, defendant testified in his defense. Corey testified for the state. Their respective stories of the events which occurred vary significantly.

"FN1. Corey Brown's first name is also spelled Cory in portions of the record.

"FN2. State v. Mitchell, 33,277 (La.App.2d Cir.3/1/00), 753 So.2d 985.

"FN3. State v. Lowery, 33,584 (La.App.2d Cir.6/21/00), 765 So.2d 461.

"On February 18, 1998, the defendant, a Shreveport resident, was in Ruston to visit his hospitalized grandmother. He intended to spend the night at his mother's house on Farmerville Street. While using a pay phone at a convenience store across the street from his mother's house, defendant saw and spoke with Derrick Mitchell ('Derrick'). The defendant was invited by Derrick to go "riding in the country with him." The defendant's brother, Darryl Lowery, was also there and went along on the ride. Once they were in Derrick's car, the three men drove to Derrick's father's 'old homeplace' ('the old house') in rural Lincoln Parish. When they arrived at the old house, defendant testified that he was greeted by Charlie Lewis ('Charlie'), who he learned was living at the house. The defendant was also introduced to Corey, who was also living at the house. Corey testified that they had come to the house to pick up drugs, specifically cocaine. At trial, the defendant testified that he did not have a specific purpose in going with Derrick and he was just 'killing time.'

"Shortly after they arrived, Derrick went behind the old house to look for the drugs he had hidden. Corey testified that Derrick was looking for the drugs because the defendant was going to sell them to 'one of his partners.' When Derrick returned to the house he informed the men that he could not find the drugs and accused Charlie of having taken them. Derrick had a gun and began to threaten to shoot Charlie unless he told him where the drugs were. Derrick fired the gun twice in an effort to frighten Charlie, then Derrick forced Charlie outside to look for the drugs. According to the defendant, they all

3

went outside on this occasion to search for the drugs. However, because of the darkness, the drugs could not be located and Derrick became enraged, continuing to accuse Charlie of stealing the drugs. Derrick began to beat Charlie with a board. The defendant told Derrick to stop beating Charlie, that 'it wasn't worth killing him.' Corey testified that the defendant continued to tell Charlie that he should tell Derrick where the drugs were. Thereafter, Charlie, who could not walk as the result of his injuries, was carried outside to the car and placed in the trunk of Derrick's car. The defendant testified that Derrick intended to take Charlie to his dad's house, while Corey testified that the defendant stated that he knew someone in Shreveport who would kill Charlie for them. They left the old house and headed west toward Shreveport. While in route, the defendant again stated that he knew someone in Shreveport who would kill Charlie. Defendant testified that they headed west because Derrick was attempting to scare Charlie by telling Charlie that the drugs belonged to 'some people' in Shreveport, and that they would take Charlie to them.

"According to Corey, approximately seven miles down the road, Derrick stopped the car. Derrick and the defendant had a discussion outside the car. After this discussion, they headed east and went to the home of Derrick's father, Willie Roy Mitchell. During this entire time, Charlie was captive in the car. When they arrived at Mr. Mitchell's home, Derrick got out of the car and spoke to his father. Both Mr. Mitchell and his co-habitant girlfriend, Janice Spencer, came outside to the car. Corey testified that both Mr. Mitchell and Ms. Spencer questioned Charlie about taking the drugs and tried to convince Derrick not to harm Charlie. Derrick got into the car and drove back to the old house.

"When they arrived back at the old house, Derrick and Darryl removed Charlie from the trunk and propped him against the car's rear bumper. At this time, approximately 2:30 or 3:00 a.m., Charlie was still alive. According to the defendant, Mr. Mitchell, his daughter Pat Mitchell, and Ms. Spencer arrived and continued to question Charlie regarding the drugs. Derrick, Darryl and Corey then tied Charlie's hands, feet and mouth and took him into the back room of the old house. Corey stayed at the old house. Derrick, Darryl and the defendant left, stopped at Mr. Mitchell's to switch cars, and then Derrick drove the defendant and Darryl to their mother's

house in Ruston.

"The following morning, Derrick and the defendant returned to the old house, driven there by Mario Spivey ('Mario'). The defendant testified that the only reason he went with Derrick that morning was to protect Charlie from further harm. However, before entering the house, all three men searched for and located the missing drugs. When they went to the back room of the house to check on Charlie they discovered that he was dead. Defendant testified that Mario suggested that they dispose of the body by burning it. Corey testified that they had decided to dump the body in a well, and that Derrick, the defendant and Mario left and returned again, this time with Darryl, but not Mario. At this time, they were driving Derrick's girlfriend's car and had to remove toys and clothing from the trunk to make room for the body. The defendant helped Corey remove these items from the trunk.

"Derrick, Darryl, Corey and the defendant drove to a rural spot off of a logging road to dispose of the body. Defendant claims that he told Derrick he did not want to be involved with the disposal of the body and got out of the car. Corey testified that the car got stuck in mud on their way into the wooded area. The defendant helped push the car out of the mud and stayed behind on the road as a lookout. Corey further testified that when Derrick and the defendant went to pick up Darryl, they had purchased a gasoline can and filled it with gasoline so they could burn the body, if necessary. When they discovered that the well was full, Derrick and Darryl proceeded to burn the body which was wrapped in carpet from the old house. The body did not burn completely, so they dug a grave. They then covered the body with dirt and leaves to conceal it.

"While the men were driving out of the woods on the logging road, their car got stuck in the mud again. Derrick walked toward the main road where the defendant was waiting and the two men went to the nearby house of Michael Perkins. Derrick, who knew Perkins, asked if they could use his telephone to call for help because his car was stuck. Perkins noted that both Derrick and the defendant were covered with mud and that they were evasive about where they had gotten stuck. Although Perkins could not identify the defendant as the individual with Derrick that day, defendant admitted during cross-examination that he had gone to Perkins' house. When Derrick could not reach his uncle on the

5

telephone, he and the defendant hitched a ride with a passing vehicle and eventually returned with Derrick's uncle's truck. Before they left the logging road, the defendant used a pine tree limb to sweep the car tracks in an effort to 'cover up' the fact that the car had been driven down that road.

"Derrick, Darryl, Corey and the defendant returned to the old house to remove any evidence of the crime. Corey testified that the defendant scooped up blood drops from the ground into a container. The four men then traveled to Arcadia. On the way to Arcadia, they threw the items they had collected into a trash pile on the side of a road in Bienville Parish. Corey and Darryl cleaned the mud from the car at a car wash, while Derrick called a female friend to rent a motel room. Corey purchased new clothing for himself, Derrick and Darryl. They bathed and changed clothes in the motel room. The four men stayed at the motel room for some time before returning to Lincoln Parish. Derrick dropped Corey off at the old house and the defendant and Darryl were taken to their mother's house.

"During cross-examination, the defendant admitted that:
  1) His vehicle was available to him at his mother's house when these events occurred.
  2) His mother had a telephone at her home.
  3) He took no affirmative action in an attempt to stop the beating of Charlie Lewis or the destruction and concealment of his body.
  4) He did nothing to notify the police of the beating and kidnapping of Charlie, nor did he report his death.
  5) He has been convicted twice for possession of cocaine.
  6) He knew that Derrick was returning the following day to look for the drugs. He helped Derrick search for the drugs in the woods behind the old house before going inside to check on Charlie Lewis, and
  7) The crimes of second degree murder, aggravated kidnapping and obstruction of justice occurred in regard to the death of Charlie Lewis.

"Willie Roy Mitchell and Janice Spencer were witnesses for the state. Both confirmed that Derrick, Darryl, Corey and the defendant drove to their home that night with Charlie held captive in the trunk of Derrick's car. Further, both testified that the defendant made statements to the effect that they were taking Charlie to

Shreveport to have him killed. The state also called Dr. Steven T. Hayne as a witness. Dr. Hayne testified that Charlie Lewis died of cerebral trauma to the brain caused by being struck with a blunt object. Dr. Hayne also testified that Mr. Lewis had several lacerations about his head and body, fractures of both the left and right tibias and fibulas (four fractures) and fractured ribs. In addition, Lewis's body was notably charred from the attempted incineration. Lincoln Parish Sheriff's Deputy Steve Rogers also testified at length about his extensive investigation of this crime.

"Other than his own testimony, the defendant did not present any witnesses or exhibits."

## Rule 8(a) Resolution

This court is able to resolve the merits of this habeas corpus petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact that is relevant to the petitioner's claims, and the State court records provide the required and adequate factual basis necessary to the resolution of the habeas corpus petition. Moya v. Estelle, 696 F.2d 329, 332-33 (5th Cir. 1983); Easter v. Estelle, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

## Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall be considered only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to habeas petitions filed after its effective date on April 24, 1996,

habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an *unreasonable determination* of the facts in light of the evidence presented in the State Court proceeding. Therefore, pure questions of law and mixed questions of law and fact are reviewed under Section 2254 (d)(1), and questions of fact are reviewed under Section 2254(d)(2). Martin v. Cain, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S. 885, 122 S.Ct. 194 (2001), and cases cited therein.

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts. Martin, 246 F.3d at 476, and cases cited therein.

A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly

established federal law was objectively reasonable. A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also unreasonable. Martin, 246 F.3d at 476, and cases cited therein.

## Law and Analysis

### Issue No. 1 - Sufficiency of the Evidence

Lowery contends there was insufficient evidence to support the verdicts finding Lowery guilty of second degree murder and obstruction of justice.

Habeas relief on a claim of insufficient evidence is appropriate only if it is found that, upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. West v. Johnson, 92 F.3d 1385 (5th Cir. 1996), cert. den., 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997), citing Jackson v. Virginia, 443 U.S. at 322-26, 99 S.Ct. at 2791-92.

A jury's determination of witness credibility, the inferences made on the evidence, and the jury's reasonable construction of the evidence is entitled to a great deal of deference by a reviewing court. Marshall v. Lonberger, 459 U.S. 422, 433-35, 103 S.Ct. 843, 850-51 (1983). In addition, where there has been a thoughtful review of the sufficiency of the evidence by a state appellate court, that court's findings are entitled to great weight.

9

Jackson, 443 U.S. at 322 n.15, 99 S.Ct. at 2790 n.15.

Lowery was convicted of second degree murder pursuant to the felony murder statute, 14:30.1(A)(2)(a), which states, "Second degree murder is the killing of a human being: ...(2)(a) When the offender is engaged in the perpetration or attempted perpetration of ...aggravated kidnapping, second degree kidnapping, ..., even though he has no intent to kill or to inflict great bodily harm." Lowery argues the evidence does not support his conviction for second degree murder under the felony-murder statute because his conviction for aggravated kidnapping was reversed by the Louisiana Second Circuit Court of Appeal. However, Lowery's aggravated kidnapping conviction was reversed on double jeopardy grounds, not because there was insufficient evidence to support that conviction. Therefore, the reversal of Lowery's aggravated kidnapping conviction does not require reversal of his second degree murder conviction for insufficient evidence.

Next, Lowery contends the evidence does not support his second degree murder and obstruction of justice convictions because he never touched the victim and he did not possess the specific intent to kill the victim. However, as the felony-murder statute states, one need not possess specific intent to kill or inflict great bodily harm to be guilty of second degree felony murder. Instead, in this case, the State had to prove that Lowery, as a principal, had the specific intent to commit aggravated kidnapping, which was

the felony offense underlying the second degree felony-murder.

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. Only those persons who knowingly participate in planning or executing a crime are principals to that crime. Mere presence at the scene of a crime is not enough to make one a principal. Moreover, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. The mental state of one defendant may not be imputed to another defendant. See State v. Hayes, 01-736 (La. App. 5th Cir. 12/26/01), 806 So.2d 816, 823, writ den., 2002-0263 (La. 10/25/02), 827 So.2d 1169 (defendant who waited outside and drove the get-away car was guilty as a principal to armed robbery and second degree murder), and cases cited therein. While mere presence at the scene of a crime does not make one a principal to the crime, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention. Hayes, 806 SO.2d at 823-824, citing State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1225.

Therefore, the inquiry is whether the State proved that Lowery

11

was aware of the others' intent to commit aggravated kidnapping. See Hayes, 806 So.2d at 824.

The evidence adduced at trial indicates that Lowery had the specific intent, along with the others, to kidnap the victim in order to coerce him into telling them where he had put the cocaine; the cocaine sale had been arranged for Lowery, Lowery stood by while Mitchell beat the victim with a 2X4 and loaded the victim into the trunk of his car, Lowery told the victim he knew someone in Shreveport who would kill him, Lowery and the others initially drove the car toward Shreveport in an attempt to scare the victim, and Lowery, as well as the others, left the victim tied up in the vacant house overnight. The victim died while held in captivity overnight. Therefore, the State proved Lowery had the specific intent to commit aggravated kidnapping, and did not have to prove Lowery (or anyone else) had the specific intent to kill the victim.

Lowery relies on his claim that he never touched the victim. However, as La.R.S. 14:24 provides: "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Lowery does not deny that he was present for the entirety of the offense, or that he failed to report the beating and the kidnapping to the police. Moreover, contrary to Lowery's assertions, Corey Brown's testimony

12

shows that Lowery threatened the victim after he had been tied up, acted as a look-out when the others were attempting to dispose of the victim's body, and actively assisted in attempting to conceal evidence of the crimes. Therefore, it was not necessary that Lowery actually touch the victim. There is sufficient evidence to support Lowery's conviction for second degree felony murder based upon aggravated kidnapping as well as his conviction for obstruction of justice. Compare, <u>State v. Bessar</u>, 213 La. 299, 312, 34 So.2d 785, 789 (1948) ("Clearly under the facts as set out hereinabove the deceased was killed by Powell in the furtherance of the object of the joint enterprise he and Bessar embarked upon, that is, aggravated robbery...."); <u>State v. Jones</u>, 2000-2009 (La. App. 1st Cir. 5/11/01), 808 So.2d 609, 614, writ den., 2001-1698 (La. 5/3/02), 815 So.2d 93 (defendant was guilty as a principal because he acted as lookout while the victim was tied up, beaten, and fatally shot); <u>State v. Hayes</u>, 806 So.2d at 824.

As to the obstruction of justice conviction, La.R.S. 14:130.1 provides in pertinent part: "A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described: (1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or

proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either: (a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers;... ." State witness Corey Brown testified that, while the others removed the victim's body from the trunk, Michael Lowery watched the road for other vehicles (Tr. p. 2923), as they were leaving the woods, Michael Lowery used a pine limb to obliterate the tire tracks from the ground (Tr. p. 2930), and when they returned to the house to gather the incriminating evidence, Michael Lowery scooped up bloody dirt in the front yard and put it into a container which he later threw away (Tr. p. 2929). Brown's testimony clearly supports Lowery's obstruction of justice conviction.

Finally, although Lowery contends the State's witnesses lied when they testified he had threatened the victim, he offers the court no evidence to support that contention.

This ground for relief is meritless.

Issue No. 2 - Grand Jury Foreperson

Next, Lowery contends there was a racially discriminatory system of selecting his grand jury foremen in Lincoln Parish in 1998, which violated Lowery's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments.

Under Louisiana law, a challenge to the eligibility of the grand jury venire must be made by a pretrial motion to quash. Under La.C.Cr.P. art. 535(D), the grounds for a motion to quash are waived unless a motion to quash is filed. Williams v. Cain, 125 F.3d 269, 274 (5th Cir. 1997), cert. den., 525 U.S. 859, 119 S.Ct. 144 (1998). Although Lowery's attorney did not file a motion to quash the indictment on the basis of racial discrimination in the selection of the grand jury foreperson, the Second Circuit Court of Appeal considered the merits of this claim pursuant to Lowery's application for post-conviction relief (Resp. Ex. Vol. 15, p. 3462). Therefore, this claim is not procedurally barred.

As to the selection procedure, it has already been held by the Fifth Circuit in Guice v.Fortenberry, 633 F.2d 699,703 (5th Cir. 1980), on rehearing, 661 F.2d 496 (5th Cir. 1981)(Guice I and Guice II), that Louisiana's previously used grand jury foreperson selection process, La.C.Cr.P. art. 413, whereby eleven grand jurors were selected by lot but the foreperson (who was the twelfth grand juror) was selected by the judge from the venire, was susceptible of abuse and was not racially neutral. Since the grand jury foreperson's role is not merely ministerial because the foreperson is a voting member of the grand jury, the composition of the grand jury itself was affected. See La.C.Cr.P. art. 413. A claim of discrimination in the selection of the grand jury foreperson must

be treated as a claim in the selection of the grand jury itself. Campbell v. Louisiana, 523 U.S. at 396-97 & 340-43, 118 S.Ct. at 1422, 1424-25 (1998); Guice, 633 F.2d at 704. Also, Guice, 722 F.2d 276, 278-281 (5th Cir.1984) (Guice III).

Article 413 was amended by Acts 1999, No. 984, § 1, to change the selection procedure providing for a random selection of the grand jury foreperson, rather than selection of the foreperson by the judge. Therefore, contrary to the Louisiana appellate court's conclusion, Lowery's 1998 grand jury foreperson was selected pursuant to the old, unconstitutional procedure. Accordingly, this court must determine whether Lowery was prejudiced thereby.

2.

It is unconstitutional to discriminate against black persons in the selection of the grand jury and grand jury forepersons. Rose, 443 U.S. at 565, 99 S.Ct. at 3005. Also, Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419 (1998); Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1224 (1972).

To be entitled to habeas relief, the petitioner must prove an equal protection violation has occurred in the context of grand jury foreperson selection by showing that the procedure employed resulted in substantial under-representation of a particular race or identifiable group. Specifically, a petitioner must prove a prima facie case with regard to the foreperson as follows: (1) establish that the group is one that is a recognizable, distinct

16

class, singled out for different treatment under the laws, as written or as applied; (2) prove the degree of under-representation by comparing the proportion of the group in the total population called to serve as foreperson over a significant period of time (this method of proof is called the "rule of exclusion"); and (3) show that the selection procedure is susceptible to abuse or is not racially neutral, to support the presumption of discrimination raised by the statistical showing. Only if a petitioner establishes a prima facie case of discrimination in the selection of the foreperson in accord with this approach does the burden shift to the State to rebut that prima facie case. Rose v. Mitchell, 443 U.S. 545, 565, 99 S.Ct. 2993, 3005 (1979). The petitioner may also prove a prima facie case without showing a statistical disparity over a significant period of time; he may satisfy his prima facie burden by showing a disparity in the particular grand jury body that indicted him, coupled with proof either that (1) the selection process was itself not racially neutral and presented an opportunity for discrimination, or that (2) the jury commissioners had made no attempt to acquaint themselves with eligible members of the black community. Rideau v. Whitley, 237 F.3d 472, 485 (5th Cir. 2000), cert. den., 121 S.Ct. 2539 (U.S. 2001).

The State may rebut the presumption of discrimination by showing the pattern of under-representation proven at Step 2 was

the result of a "racially neutral selection procedure." <u>Guice</u>, 722 F.2d at 280, quoting <u>Alexander v. Louisiana</u>, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226 (1972). However, testimony that merely affirms good faith in making individual juror selections is insufficient to dispel a prima facie case of systematic exclusion. <u>Guice</u>, 722 F.2d at 280, citing <u>Turner v. Fouche</u>, 396 U.S. 346, 90 S.Ct. 532 (1970). Also, <u>Castaneda</u>, 430 U.S. at 499, 97 S.Ct. at 1282; <u>Hernandez v. Texas</u>, 347 U.S. 475, 74 S.Ct. 667 (1954); <u>Norris v. Alabama</u>, 294 U.S. 587, 598, 55 S.Ct. 579, 584 (1935). Testimony as to objective criteria or guidelines under which the judges selected grand jury forepersons can rebut a prima facie case of discrimination. <u>Guice</u>, 722 F.2d at 281, <u>U.S. v. Perez-Hernandez</u>, 672 F.2d 1380 (11th Cir. 1982).

3.

In the case at bar, Lowery attempted to prove the degree of under-representation of black persons as grand jury forepersons in Lincoln Parish by submitting the Lincoln Parish voter registration statistics from 1960 through 1997. Lowery failed to submit a list of the grand jury forepersons actually appointed for the relevant time frame.[1]

However, this court need not determine whether black persons

---

[1] Although Lowery alleges there were no black grand jury forepersons in Lincoln Parish, this court has dealt with the same issue in another case involving Lincoln Parish and is aware there have been black grand jury forepersons in that parish. <u>Howard Lamar Ray v. Burl Cain</u>, No. CV99-0198-M (W.D.La. 2000), aff'd, 71 Fed.Appx. 442 (5th Cir. 2003).

have been statistically under-represented as grand jury forepersons in Lincoln Parish because the State has shown that Lowery's grand jury foreperson was selected through a racially neutral selection procedure. The minutes from the grand jury which indicted Lowery indicate the selection of the grand jury foreperson was made pursuant to a name pulled from the grand jury venire by the Lincoln Parish Sheriff (Vol. 1, p. 1). After the potential grand juror's name was pulled, she was questioned by the court as to her qualifications to serve as a grand juror. Eleven additional grand jurors and two alternates were then added. According to the Respondent's brief, and as indicated in the court minutes in Lowery's case, Lincoln Parish began employing a racially neutral grand jury foreperson selection process prior to the State's modification of the process by amendment of La.C.Cr.P. art. 413 in 1999.

Therefore, the State has shown that a racially neutral selection procedure was employed for selection of the grand jury foreperson in Lowery's case. Since Lowery cannot prove the third prong of his burden of proving an equal protection violation occurred, this claim is meritless.

Issue No. 3 - Ineffective Assistance of Counsel

Next, Lowery alleges he was denied the right to effective assistance of counsel due to his trial counsel's failure to (1) challenge the discriminatory practice of appointing grand jury

foremen, (2) file a motion to quash the unconstitutional selection process used to select grand jury foremen in Louisiana, (3) object to the jury charge on principals, and (4) subpoena witnesses to testify favorably for the defense.

To prevail on a habeas complaint of ineffective assistance of counsel a complainant must demonstrate that: (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. A defendant is prejudiced if there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. To make that determination the court must examine the proceedings as a whole, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting. The court does not assess any alleged error in isolation. In an examination of state proceedings under 28 U.S.C. § 2254 the court will not reject an adjudication on the merits unless the action by the state court is found to be contrary to, or an unreasonable application of, clearly established federal law, or the state court's determination of the facts is manifestly unreasonable in light of the evidence. Jones v. Cain, 227 F.3d 228, 230 (5th Cir. 2000), and cases cited therein.

1-2.

As discussed above, Lowery's grand jury foreperson was not selected pursuant to a discriminatory practice. Counsel is not

20

required to engage in the filing of futile motions.  Murray v. Maggio, 736 F.2d 279, 283 (5th Cir. 1984), citing William v. Beto, 354 F.2d 698, 703 (5th Cir. 1965).  Therefore, Lowery did not have ineffective assistance of counsel due to his attorney's failure to file meritless motions.

3.

Next, Lowery contends his trial counsel should have objected to the jury charge on principals.  La.R.S. 14:24 defines a "principal":

> "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

The trial judge read the statute when he instructed the jury as to the law on principals (Tr. pp. 3125-3127), and further stated "Only those persons who knowingly participate in the planning or execution of a crime are principals. Mere presence at the scene is not enough to concern an individual in the commission of the offense."  These instructions are in accordance with Louisiana state law.  See State v. Knowles, 392 So.2d 651 (La. 1980); State v. Schwander, 345 So.2d 1173 (La. 1977).

Since these jury instructions are legally correct, there was no objection to be made by Lowery's attorney.

Lowery also alleges briefly that his counsel was ineffective for failing to object to the jury instruction on reasonable doubt.

21

As discussed below, the jury instruction on reasonable doubt was not unconstitutional and, therefore, Lowery's counsel had no legal basis on which to object.

Therefore, Lowery did not have ineffective assistance of counsel in this respect, either.

4.

Lowery further contends his trial counsel was ineffective for failing to subpoena witnesses to testify favorably for the defense, specifically, Derrick Mitchell and Darryl Lowery. Lowery contends they would have testified that his degree of participation in the crime of second degree murder was so minimal that the jury would not have convicted him of any higher crime than manslaughter.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993), citing Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 1052, 2066, 80 L.Ed.2d 674 (1984). However, bare allegations do not suffice. A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. Nelson, 989 F.2d at 850, citing United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989). Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because

allegations of what a witness would have testified are largely speculative. <u>Graves v. Cockrell</u>, 351 F.3d 143, 155 (5th Cir. 2003), amended in other part, 351 F.3d 156 (5th Cir. 2003), cert. den., 124 S.Ct. 2160 (U.S. 2004), citing <u>Buckelew v. United States</u>, 575 F.2d 515, 521 (5th Cir. 1978). Also, <u>Boyd v. Estelle</u>, 662 F.2d 388, 390 (5th Cir. 1981). Where the only evidence of a missing witnesses' testimony is from the defendant, the Court views claims of ineffective assistance with great caution. <u>Sayre v. Anderson</u>, 238 F.3d 631, 636 (5th Cir. 2001), citing <u>Lockhart v. McCotter</u>, 782 F.2d 1275, 1282 (5th Cir.1986), cert. den., 479 U.S. 1030, 107 S.Ct. 873 (1987). Unless a petitioner provides the court with affidavits (or similar matter) from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice. <u>Sayre</u>, 238 F.3d at 636.

In the case at bar, the two uncalled witnesses gave statements to the police, which are part of the record. Darryl Lowery, Michael Lowery's brother, gave two statements (Tr. pp. 2160-2184, 2186-2204) in which he told the police he heard Michael Lowery threaten to take the victim to Shreveport to try to scare him into telling them the location of Derrick Mitchell's missing cocaine, and that Michael Lowery had accompanied the group when they returned to the house for the victim's body. Darryl Lowery further stated that Michael was present when Derrick Mitchell beat the victim for 45 minutes with a 2X4, Michael accompanied Derrick,

Darryl, and Corey Brown when they put the victim in the trunk of a car and drove away, took the victim out of the car and left the victim overnight in an unoccupied house, Michael was with Derrick when they found the victim dead the next morning, Michael accompanied Derrick, Darryl, and Corey when they took the victim's body to the woods to burn and bury it, and Michael assisted the others in attempting to conceal and dispose of evidence of the crimes.

Mitchell told the police in his statement (Tr. pp. 2227-2257) that Michael Lowery was present when the victim was beaten, Michael tried to scare the victim by threatening to take him to Shreveport to some guys who would take care of the victim by dumping him in the river, Michael helped remove the victim from the trunk of the car and carry him into the house, and Michael returned the next day and was present when gasoline was purchased. Mitchell also stated he saw Lowery kick the victim once or twice.

Corey Brown testified for the state at Michael Lowery's trial. Brown testified that the cocaine sale was set up for Michael Lowery's benefit (Tr. p. 2906), Michael Lowery watched Mitchell beat the victim with a 2X4 and told Mitchell it was not worth killing the victim (Tr. p. 2910), and then Michael Lowery told the victim three times that he knew someone in Shreveport who would kill him (Tr. p. 2911, 2914). Brown testified that Michael Lowery returned to the house with Mitchell and another person the next

24

morning, and they, together with Brown, found the victim was dead
(Tr. pp. 2918-2919). Brown testified that he and Michael Lowery
cleared out the car trunk in order to transport the victim's body
(Tr. p. 2922). When they attempted to drive into the woods to
dispose of the body and other evidence, the car stuck in the mud;
Brown, Michael Lowery, and Darryl Lowery lifted the car to get it
out of the mud (Tr. p. 2922). While the others removed the
victim's body from the trunk, Michael Lowery watched the road for
other vehicles (Tr. p. 2923). As they were leaving the woods,
Michael Lowery used a pine limb to obliterate the tire tracks from
the ground (Tr. p. 2930). When they left the woods, the car stuck
in the mud again and Derrick and Michael Lowery left to get a truck
(Tr. p. 2926). When they returned to the house to gather the
incriminating evidence, Michael Lowery scooped up bloody dirt in
the front yard and put it into a container, which he threw away
(Tr. p. 2929). Finally, when they cleaned up in a hotel room
afterward, Michael, Darryl and Derrick all told Corey Brown not to
tell anyone about the incident (Tr. p. 2931). Brown did not
testify that Michael Lowery kicked the victim or helped carry him
from the trunk of the car into the house.

As the Respondent points out, Darryl Lowery's and Mitchell's
testimony would have supported the testimony of state's witness
Corey Brown as to the extent of Lowery's participation in the
offenses, and would not have been exculpatory or mitigating

25

evidence for Lowery.   Therefore, Lowery has not shown prejudice arising from his counsel's failure to call Darryl Lowery and Mitchell as defense witnesses.

This ground for relief is also meritless.

Issue No. 4 - Principals

Lowery argues the trial judge erroneously instructed the jury on the law of principals in regards to aiding and abetting.   As discussed in Issue No. 3, the trial judge properly instructed the jury as to the law on principals.

The fact that a jury instruction was incorrect under state law is not a basis for federal habeas relief.   A federal court may reverse a state criminal conviction based upon erroneous jury instructions only when the instruction in question rendered the entire trial fundamentally unfair.   Gissendanner v. Wainwright, 482 F.2d 1293, 1300 (5th Cir. 1973).   Also, Montoya v. Scott, 65 F.3d 405, 409 (5th Cir. 1995), cert. den., 517 U.S. 1133, 116 S.Ct. 1417 (1996).

The trial judge explained the concept of "aiding and abetting" to the jury in accordance with a special instruction requested by Lowery's counsel (Tr. p. 1572).   That instruction, taken from dictionary definitions, is not erroneous and did not prejudice Lowery in any way.   For the reasons discussed above, Lowery's arguments that there was insufficient evidence to prove he was guilty as a principal to second degree felony murder are meritless.

26

This ground for relief is meritless.

## Ground No. 5 - Jury Instruction on Reasonable Doubt

Lowery alleges the trial judge violated Lowery's due process rights when he did not properly instruct the jury on the issue of reasonable doubt. The trial judge instructed Lowery's jury as follows:

> "A reasonable doubt is not a mere possible doubt. It should be an actual doubt, such a doubt as a reasonable person would seriously entertain. It is a serious doubt for which you could give a good reason. It is not a doubt, for instance, concocted in your mind out of a feeling of sympathy for the accused to escape the just penalty of the law. Instead, it is a doubt arising out of the evidence or lack of evidence in the case. If, after giving a fair and impartial consideration to all facts in the case, you find the evidence or lack of evidence unsatisfactory upon any single point indispensably necessary to constitute the accused's guilt, then this - this, then would five rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty."

In Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 329 (1990), the Supreme Court held that jury instructions which define reasonable doubt as a "substantial doubt," a "grave uncertainty," and a "moral certainty" effectively reduce the prosecution's burden of proof to something less than a reasonable doubt. In Sullivan v. Louisiana, 508 U.S. 275, 277-78, 113 S.Ct. 2078, 280-81 (1993), the Supreme Court held the harmless error rule is inapplicable to cases in which the Cage rule is violated, and that a deficient jury instruction on reasonable doubt is a structural error which

27

requires reversal. Sullivan, 508 U.S. at 281, 113 S.Ct. at 2082-83. Finally, in Victor v. Nebraska, 511 U.S. 1, 22-23, 114 S.Ct. 1239, 1251 (1994), the Supreme Court held the test for a jury instruction on reasonable doubt is whether, "taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury." In Victor, the trial court used the phrases "a substantial doubt," "a moral certainty," and "strong probabilities" to define reasonable doubt. The Supreme Court found "there was no reasonable likelihood that the jurors who determined the petitioners' guilt applied the instructions in a way that violated the Constitution." It is not the use of a single phrase that determines whether a jury instruction is unconstitutional; instead, the instruction is examined as a whole. Dupuy v. Cain, 201 F.3d 582, 587 (5th Cir. 2000), writ den., 531 U.S. 1128, 121 S.Ct. 885 (2001), citing Victor, 511 U.S. at 22, 114 S.Ct. 1239.

Lowery argues that the phrases used by the trial judge in his jury instruction on reasonable doubt are "synonymous" with the phrases held to be unconstitutional in Cage. However, "actual doubt," "serious doubt," and "a good reason" have been held to be constitutional. See Schneider v. Day, 73 F.3d 610 (5th Cir. 1996)("It should be an actual and substantial doubt. It is such a doubt as a reasonable man would seriously entertain. It is a serious sensible doubt as such you could give a good reason for."). In the context of the whole instruction in this case, it is not

reasonably likely that the jurors misunderstood the proper burden of proof.

This ground for relief is also meritless.

## Ground No. 6 - Grand Juror

Finally, Lowery argues the State improperly withheld exculpatory evidence that supported the bill of indictment, which was obtained in violation of due process through the extraneous influential deliberations of a grand jury member that also testified on behalf of the State at the criminal trial. Specifically, Lowery contends that grand juror Powell personally knew Lowery and was aware of Lowery's prior convictions for drug offenses and his reputation. Lowery contends Powell improperly influenced the other grand jurors with "extrinsic evidence" of Lowery's prior convictions.

The rights of an accused with respect to individual grand jurors was explained in U.S. v. Knowles, 147 F.Supp. 19, 20 (D.D.C. 1957):

> "The accused may attack the legal qualifications of a grand juror, either by challenging an individual juror on the ground that the jury is not legally qualified, or by motion to dismiss the indictment because of a lack of legal qualifications of an individual juror. However, challenges for bias, or for any cause other than lack of legal qualifications, are unknown as concerns grand jurors. No provision is made for peremptory challenges of grand jurors and no such challenges are permitted. Likewise no voir dire examination exists in respect to grand jurors. In other words, the status of a member of a grand jury may not be questioned except for lack of legal qualifications. The basic theory of the functions of a grand jury, does not require that grand jurors

should be impartial and unbiased. In this respect, their position is entirely different from that of petit jurors. The Sixth Amendment to the Constitution of the United States expressly provides that the trial jury in a criminal case must be 'impartial'. No such requirement in respect to grand juries is found in the Fifth Amendment, which contains the guaranty against prosecutions for infamous crimes unless on a presentment or indictment of a grand jury. It is hardly necessary to be reminded that each of these Amendments was adopted at the same time as a part of the group consisting of the first ten Amendments. A grand jury does not pass on the guilt or innocence of the defendant, but merely determines whether he should be brought to trial. It is purely an accusatory body. This view can be demonstrated by the fact that a grand jury may undertake an investigation on its own initiative, or at the behest of one of its members. In such event, the grand juror who instigated the proceeding that may result in an indictment, obviously can hardly be deemed to be impartial, but he is not disqualified for that reason."

See also, Estes v. U.S., 335 F.2d 609 (5th Cir. 1964), cert. den., 379 U.S. 964, 85 S.C. 656 (1965), quoting Knowles. Also, U.S. v. Partin, 320 F.Supp. 275, 281 (E.D.La. 1970), citing Estes. Grand jurors sit to accuse, not convict. The grand jury need find only probable cause that the accused committed the criminal act; the petit jury must be convinced beyond a reasonable doubt. In re Bonk, 527 F.2d 120, 126 (7th Cir. 1975). See also, Martin v. Beto, 397 F.2d 741 (5th Cir. 1968), cert. den., 394 U.S. 906, 89 S.Ct. 1008 (1969)("the rule today is that the grand jury is an accusatory body which does not have to be impartial and that we depend on a fair trial"); U. S. v. Anzelmo, 319 F.Supp. 1106, 1113-1114 (E.D.La. 1970).

Finally, it is noted that La.C.Cr.P. art. 438 specifically

permits a grand juror to testify as a witness at a criminal trial:
"If a grand juror knows or has reason to believe that an offense
triable by the district court of the parish has been committed, he
shall declare such fact to his fellow jurors, who may investigate
it. In such investigation or any subsequent criminal proceeding
the grand juror shall be a competent witness." See State v. Vial,
153 La. 2d 883, 96 So. 796 (1923).

Since there is no constitutional right to a neutral, unbiased
grand jury, Lowery has not alleged a cognizable habeas claim. This
ground for relief is meritless.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that
Lowery's petition for writ of habeas corpus be DENIED AND DISMISSED
WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and
Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from
service of this Report and Recommendation to file specific, written
objections with the Clerk of Court. A party may respond to another
party's objections within **ten (10) days** after being served with a
copy thereof. A courtesy copy of any objection or response or
request for extension of time shall be furnished to the District
Judge at the time of filing. Timely objections will be considered
by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 15th day of February, 2006.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE